

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for THE BUCKHEAD COMMUNITY BANK, | ] ] ] ] |
| Plaintiff, | ] ] ] |
| v. | ] CIVIL ACTION FILE NO.: |
| R. CHARLES LOUDERMILK, SR., HUGH C. ALDREDGE, DAVID B. ALLMAN, MARVIN COSGRAY, LOUIS J. DOUGLASS III, GREGORY W. HOLDEN, JOHN D. MARGESON, LARRY P. MARTINDALE, DARRYL L. OVERALL, | ] **1:12-CV-4156** ] ] ] ] ] JURY TRIAL DEMANDED ] ] ] |
| Defendants. | ] |

## COMPLAINT

Plaintiff Federal Deposit Insurance Corporation ("FDIC"), as Receiver

("FDIC-R") for The Buckhead Community Bank ("Buckhead Bank" or "Bank"),

hereby files its Complaint against R. Charles Loudermilk, Sr. ("Loudermilk"),

Hugh C. Aldredge ("Aldredge"), David B. Allman ("Allman"), Marvin Cosgray

("Cosgray"), Louis J. Douglass III ("Douglass"), Gregory W. Holden ("Holden"),

John D. Margeson ("Margeson"), Larry P. Martindale ("Martindale"), and Darryl

L. Overall ("Overall") (Loudermilk, Aldredge, Allman, Cosgray, Douglass,

Holden, Margeson, Martindale, and Overall are collectively referred to herein as the "Defendants") for negligence and gross negligence, showing the Court the following:

## I.   INTRODUCTION

1.     FDIC-R brings this lawsuit in its capacity as receiver for Buckhead Bank, a failed financial institution. The FDIC succeeded to all rights, titles, and privileges of Buckhead Bank and its depositors, account holders, creditors, and stockholders. 12 U.S.C. § 1821(d)(2)(A)(1). This action is brought against the Defendants, nine of Buckhead Bank's former officers and/or directors for negligence and gross negligence in their operation and management of the lending function of the Bank. The FDIC seeks compensatory damages and other relief as a result of Defendants' tortious conduct (the "Damages") – all of which took place prior to the failure of the Bank. Because the tortious conduct occurred and the damages were sustained prior to the appointment of the FDIC as receiver for Buckhead Bank, the claims asserted herein do not arise out of, are not based upon, and are not attributable in any way to the appointment of the FDIC as receiver for Buckhead Bank.

2.     The Defendants were charged with, in addition to other duties, the responsibility of operating and managing the lending function of the Bank.

- 2 -

Particularly, and among other things, each of the Defendants served as members of Buckhead Bank's Director's Loan Committee (the "Loan Committee") and, in that capacity, had direct responsibility for the approval of loans. In gross derogation of their duty to engage in safe and sound banking practices, Defendants failed to properly oversee Buckhead Bank's lending function, improperly approved millions of dollars in loans, allowed and encouraged an excessive and irresponsible concentration of acquisition, development and construction ("ADC") loans, accepted loan participations from other banks and entities without conducting proper due diligence regarding the subject loans, knowingly or recklessly approved loans and loan participations which violated Buckhead Bank's loan policies (referred to cumulatively as the "Loan Policy") and applicable federal and state regulations, knowingly permitted poor underwriting in contravention of the Bank's policies and reasonable industry standards, and failed to monitor the methodology for calculating Buckhead Bank's allowance for loan and lease losses ("ALLL").

3. The actions and omissions that give rise to Defendants' liability include, among other things, originating, recommending, and/or approving loans in violation of the Bank's Loan Policy; extending credit to borrowers who were not creditworthy; extending credit based on inadequate information about the financial condition of prospective borrowers and guarantors and without adequately

analyzing cash flow and other critical financial information; approving and originating speculative commercial real estate loans despite known adverse economic conditions in the local real estate market; permitting unsafe and unsound concentrations of credit; failing to properly manage and preserve the resources of the Bank; and failing to supervise, manage, conduct, and direct the business and affairs of the Bank to ensure compliance with prudent principles of banking.

4.     The Defendants' negligent and grossly negligent conduct giving rise to their liability is highlighted by their repeated approval of the Bank's purchase of participation interests in higher-risk commercial real estate ("CRE") and ADC loans without Buckhead Bank having conducted its own independent underwriting of the loans, as required by the Loan Policy. Instead, the Defendants improperly approved these loan participation purchases based on inadequate underwriting by other institutions, most notably First City Bank of Stockbridge, Georgia ("First City"), which failed and went into receivership on March 20, 2009.

5.     As described in detail below, the Defendants' negligence and gross negligence in their numerous, repeated, and obvious breaches and violations of the Bank's Loan Policy, underwriting requirements, banking regulations, and prudent and sound banking practices are exemplified by thirteen (13) CRE and ADC loans and loan participations approved by the Defendants from December 20, 2005,

through June 10, 2008 (collectively, the "Exemplar Loans"), which proximately caused Damages to the Bank of an amount to be proven at trial in excess of $21.8 million.

6.     The FDIC-R does not seek repayment of any of the negligently made loans described in this Complaint. The compensatory damages sought herein are those caused by the Defendants' wrongful conduct in approving such loans.

7.     The actions and inactions of Defendants were the direct and proximate cause of the Damages the FDIC-R now seeks to recover.

## II.     JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction of this matter because actions in which the FDIC is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, *et seq.*; 12 U.S.C. § 1819(b)(1) and (2); and 28 U.S.C. §§ 1331 and 1345. The FDIC has the power to bring suit in any court of law. 12 U.S.C. § 1819.

9.     This Court has personal jurisdiction over Defendants who at all relevant times were residents of and conducted Buckhead Bank's business in the State of Georgia.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b) as one or more of the Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

### III.   THE PARTIES

11.     The FDIC is an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e), with its principal place of business in Washington, D.C.   12 U.S.C. § 1821(d). Upon the Bank's failure on December 4, 2009, the FDIC succeeded to all rights, titles, and privileges of Buckhead Bank and its depositors, account holders, creditors, and stockholders.   12 U.S.C. 1821(d)(2)(A)(1).

12.     FDIC-R is the successor to, among others, all claims originally held by any stockholder, member, account holder, or depositor of Buckhead Bank upon the Bank's failure.

13.     Loudermilk founded Buckhead Bank on February 6, 1998. Throughout the Bank's existence, Loudermilk served as its Chairman of the Board, was a member of the Loan Committee, and was the largest shareholder in the Bank's holding company, Buckhead Community Bancorp, Inc. ("BCB"). Loudermilk is a resident of the State of Georgia residing in Fulton County.

14. Aldredge was a director and member of the Loan Committee throughout the Bank's existence from its founding until it failed. Aldredge is a resident of the State of Georgia residing in Fulton County.

15. Allman was a director and member of the Loan Committee from December 6, 2003, until the Bank failed. Allman is a resident of the State of Georgia residing in Fulton County.

16. Cosgray was President, Chief Executive Officer ("CEO"), a director, and a member of the Loan Committee throughout the Bank's existence. Cosgray is a resident of the State of Georgia residing in Fulton County.

17. Douglass was the President of Alpharetta Community Bank, a branch office of Buckhead Bank, a director, and a Loan Committee member from February 9, 2004, until the Bank failed. Douglass is a resident of the State of Georgia residing in DeKalb County.

18. Holden was the President of Sandy Springs Bank, a branch office of Buckhead Bank, and a member of the Loan Committee from June 1, 2005, until the Bank failed. Holden is a resident of the State of Georgia residing in Cobb County.

19. Margeson was a director and member of the Loan Committee throughout the Bank's existence. Margeson is a resident of the State of Florida residing in St. John's County.

- 7 -

20.    Martindale was Vice Chairman of Buckhead Bank's Board of Directors and a member of the Loan Committee throughout the Bank's existence. Martindale is a resident of the State of West Virginia residing in Jefferson County.

21.    Overall was Executive Vice President, Senior Loan Officer, and a member of the Loan Committee throughout the Bank's existence.  Overall is a resident of the State of Georgia residing in Gwinnett County.

22.    During the relevant time, Defendants Loudermilk, Aldredge, Allman, Cosgray, Douglass, Margeson, and Martindale served as Buckhead Bank directors (the "Director Defendants").  In addition to their roles as directors, Defendants Cosgray and Douglass also served as Buckhead Bank officers, along with Defendants Holden and Overall (the "Officer Defendants").

## IV.    FACTS

23.    Buckhead Bank opened for business on March 9, 1998, as a national bank regulated by the Office of Comptroller of the Currency.  On July 1, 2005, the Bank converted its charter to a state nonmember bank.

24.    Throughout its history, Buckhead specialized in high risk CRE and ADC loans, primarily in and around Atlanta.  Buckhead Bank's original branch, located in the Buckhead neighborhood of Atlanta, Fulton County, Georgia, operated under the trade name "The Buckhead Community Bank."   In 2000,

Buckhead opened a second branch in Fulton County, which operated under the trade name "The Sandy Springs Community Bank."

25.     In or around 2005, the Defendants implemented an aggressive growth strategy for the Bank. In keeping with its growth plan, the Bank began to both rapidly grow its loan portfolio and open new branches, which included the opening of three *de novo* branches and acquiring the First National Bank of Forsyth County ("Forsyth"), located in Cumming, Georgia in December of 2007. The *de novo* branches operated under the trade names, "The Midtown Community Bank", "Alpharetta Community Bank", and "Cobb Community Bank." The two branches previously owned and operated by Forsyth became the "Forsyth Community Bank" and the "Hall Community Bank."

26.     At the time of its failure, Buckhead Bank operated seven full service locations, all in the metropolitan area of Atlanta, Georgia.

**A.     Standards for Risk Management Procedures in Banking**

27.     It is a fundamental tenet of banking that loan underwriting practices are the primary determinant of a bank's credit risk and credit availability and one of the most critical aspects of loan portfolio risk management. Functionally, loan underwriting standards define the bank's desired level of creditworthiness for individual loans and provide uniform criteria for evaluating loans with similar

- 9 -

characteristics. Loan underwriting standards are also important in protecting the bank's capital which can erode from unsafe and unsound lending practices.

28.     Underwriting practices (which are described in Part 364 and 365 of the FDIC Rules and Regulations) can generally be characterized by the criteria used to qualify borrowers, loan pricing, repayment terms, sources of repayment, and collateral requirements.     Underwriting practices also encompass the management and administration of the loan portfolio, including its growth, concentrations in specific markets, out-of-area lending, written lending policies, and adherence to written underwriting policies.

29.     The loan approval process is a bank's foremost means to control loan quality and maintain the integrity of a bank's loan portfolio. An effective loan approval process establishes minimum requirements for the information and analysis upon which a credit decision is based. The purpose of a loan approval process is to provide controls to ensure acceptable credit, collateral, and repayment sources at origination.

30.     Risk diversification is fundamental to the proper management of any Bank's loan portfolio. 12 C.F.R. § 30, "Standards for Safety and Soundness" (appendix B), requires banks to accord adequate consideration to concentrations of credit risk in their underwriting practices.

- 10 -

**B.    Defendants Failed to Follow the Fundamental Tenets of Banking in Administering the Loan Approval Process and Managing Buckhead Bank's Loan Portfolio**

31.    Beginning in 2005, the Defendants recklessly and on an uninformed basis caused Buckhead Bank to embark on an aggressive growth strategy. To that end, Buckhead Bank began to significantly increase its concentration in higher-risk CRE and ADC loans, including many loan participations with First City.

32.    From 2005 to 2007, Buckhead Bank's assets (*i.e.*, loans) increased by more than 240%, consisting largely of growth in higher-risk CRE and ADC loans funded with noncore deposits. Corresponding with this dramatic increase in ADC and CRE lending (and during the time period during which the Defendants approved the Exemplar Loans), the Bank's adversely classified assets increased from 12.62% of tier 1 capital as of December 31, 2005, to 236% of tier 1 capital as of December 31, 2008.

33.    Not only was Buckhead Bank's growth in ADC and CRE loans extreme by any objective standard, it also far-surpassed the concentrations of these types of loans held by other similarly-sized banks. In every year from 2004 to 2008 the Bank's ADC loans as a percentage of total capital surpassed its peer group average by a wide margin. Compounding Buckhead Bank's concentration risk, the Director Defendants' approval of the Forsyth acquisition in 2007

significantly added to Buckhead Bank's already critical overconcentration in ADC/CRE loans. Indeed, as of September 30, 2007, just prior to the merger, Forsyth's ADC and non-owner occupied CRE concentrations as a percent of Total Capital were 354 percent and 600 percent, respectively. By December of 2008, Buckhead Bank's ADC loans as a percentage of total capital had reached 494% for Buckhead Bank, which was approximately five times greater than that of its peer group. The comparison of these figures during this time period is set forth below:

| | | |
|---|---|---|
| December 31, 2004 | 353 | 81 |
| December 31, 2005 | 372 | 104 |
| December 31, 2006 | 446 | 117 |
| December 31, 2007 | 475 | 124 |
| December 31, 2008 | 494 | 111 |
| September 30, 2009 | 1,870 | 92 |

34.    Defendants knew or should have known that concentrating a loan portfolio in CRE/ADC loans substantially increases a bank's risk for numerous reasons, including the well-known principles that:  (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the real estate and housing markets, in particular, are cyclical by nature; (c) the primary

source of repayment for these types of loans is the cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high CRE/ADC concentrations. In short, concentrations of CRE/ADC loans in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices and concentration ratios.

35.   The Defendants were regularly provided with information of key economic indicators, such as housing sales and home prices, which were used in the underwriting process. Despite receiving information showing a slowing of housing sales and peaking of home prices in 2006, Defendants continued to approve high risk and speculative ADC and CRE loans and loan participations, including the Exemplar Loans.

36.   Moreover, between 2005 and 2008, examiners criticized the Bank for excessive concentration in ADC loans, approving loans that exceeded acceptable loan-to-value ("LTV") ratios, failing to sufficiently monitor outstanding loans, maintaining lax underwriting practices and inadequate loan administration, and marked increases in the Bank's adversely classified assets. The Defendants took no corrective action in response to these criticisms. Instead, each of the Defendants continued to approve improvident loans and loan participations that

- 13 -

violated the Bank's Loan Policy by relying for repayment on the value of collateral instead of the borrower's ability to repay, failing to obtain complete or accurate borrower financial information, approving loans secured by real estate outside of the Bank's primary lending area, purchasing participations without fully complying with Buckhead Bank's underwriting standards, and approving loans with excessive LTV ratios.

37.     Additionally, the Defendants failed to perform adequate or thorough financial analysis on many of its largest loans and loan participations, thereby escalating the risk that the repayment capacity of borrowers would be insufficient; a risk that eventually caused catastrophic losses.   Additionally, renewals were extended on a regular basis without the same analysis as an original loan, thereby violating the Loan Policy guidelines and further deteriorating the quality of the Bank's loan portfolio.   Further, the Defendants recklessly failed to obtain current appraisals on numerous properties, recklessly failed to monitor loan disbursals, and failed to implement on-site inspections and enforce the necessity that the draw schedule match the appropriate construction percentage.

38.     As reflected in the Bank's Board minutes, Loudermilk and other Defendants began questioning the strength of the Atlanta real estate market at least as early as the Board's August 22, 2006 meeting.   Subsequent Board minutes

- 14 -

throughout 2006 and 2007 show that Board members were aware of a general decline in economic conditions in the local real estate market. Despite this, the Defendants recklessly continued on their course of approving high risk but poorly underwritten CRE and ADC loans.

## C.  Buckhead Bank's Loan Approval Authorities and Loan Policy

39.  Buckhead Bank's Loan Policy dated August 23, 2005, was amended on October 30, 2006, and periodically thereafter. However, the policy provisions relevant to the Exemplar Loans were not materially amended and are as follows:

A. Borrowers and guarantors were required to provide current financial information including financial statements and tax returns for each new loan and renewal.

B. Purchase of a loan participation required analysis in accordance with Buckhead Bank's credit standards as if Buckhead Bank originated the loan itself, including, but not limited to, an analysis of collateral quality and a credit file.

C. The Bank's primary lending area was limited to five communities within metropolitan Atlanta, Georgia.

D. The maximum LTV ratio allowed was 65 percent for a raw land loan, 75 percent for a land development loan, and 80 percent for commercial and residential construction loans.

E. A complete appraisal was required for each loan in excess of $100,000 secured by real estate.

F. Demonstrated cash flow was required to be the primary source of loan repayment with collateral providing a secondary source of repayment.

G. Sound credit analysis was to precede all loan decisions, and the Bank was to be conservative in its loan approval process.

40.     Each of the Exemplar Loans required approval by the Loan Committee, which was required to approve unsecured loans in excess of $250,000 and secured loans in excess of $750,000. Although the Loan Committee during the relevant time period consisted of nine voting members, only three voting members were needed to make up a quorum for purposes of approving loans. Typically, four to eight voting members attended Loan Committee meetings. Loans were approved by a majority vote of Loan Committee members present.

**D.     Loan Underwriting Violations and Deficiencies**

41.     As detailed herein, substantial losses were sustained by reason of Defendants' material and reckless departures from safe and sound banking

- 16 -

practices. Each of the Defendants repeatedly knowingly or recklessly disregarded the Bank's Loan Policy and approved loans and loan participations involving borrowers who were not creditworthy and/or projects that provided insufficient collateral and guarantees for repayment. Between at least December 20, 2005, through June 10, 2008, Defendants repeatedly engaged in a pattern and practice of knowingly or recklessly approving loans and loan purchases that: 1) violated the Bank's Loan Policy, including, without limitation, the policy provisions in paragraph 39 above; 2) evidenced systematic deficiencies in the credit underwriting, approval, and administration process; and 3) violated sound and prudent banking practices including, but not limited to, the general safety and soundness and underwriting standards of 12 C.F.R. § 364.101, Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

## 13 Exemplar Loans

42.     Each of the Exemplar Loans violated Buckhead Bank's Loan Policy in numerous respects and illustrate, but are not exhaustive of, the types of failures, breaches, and violations of duty that each of the Defendants committed that resulted in the catastrophic losses and that constitute negligence and gross negligence either separately or together as a pattern or practice.

- 17 -

## THP, LLC[1]

43.     Buckhead Bank purchased a participation interest in a $2,995,000 loan to THP, LLC.   Buckhead Bank's participation portion was $2,195,000, approximately 73%.  Holden recommended this participation purchase, and it was approved by Aldredge, Cosgray, Douglass, Martindale, and Overall on December 20, 2005.  The stated purpose of the loan was to purchase 35.69 sewered acres located off of Feagan Road, Clayton County, Georgia, and develop the land into 110 residential lots.

44.     The violations of duties by the aforementioned Defendants in regard to the THP, LLC transaction include, but are not limited to, the following:

   a) Notwithstanding Buckhead Bank's large participation interest in the loan, the aforementioned Defendants "rubber-stamped" this participation purchase and failed to analyze the loan in accordance with its own credit standards as if it had originated the loan, in material violation of the Loan Policy.

   b) The participation was purchased without adequate financial information from the borrowers or guarantors.   The credit

---

[1] Borrowers/guarantors are identified in this Complaint by their initials only in order to preserve their right to financial privacy afforded by applicable Georgia and federal banking laws.  The Defendants, however, will be provided with the complete names of borrowers/guarantors.

memorandum on file, which was not dated or signed, indicated the net worth of the borrowers and guarantors, but there were no financial statements on file to support these figures.  The Loan Policy also required the Bank to obtain credit reports for each borrower and guarantor, but the loan file did not contain credit reports for the borrowers or guarantors at the time the loan was approved.  When the Bank renewed its participation interest in March of 2007, the recommended Defendants approved this renewal relying on questionable financial statements from the borrowers that were not signed and were not CPA-prepared.

c) Defendants Aldredge, Margeson, and Allman approved the renewal of the Bank's participation interest in March of 2007.  When they approved the renewal, the aforementioned Defendants relied on a stale appraisal.  Because they did not obtain an updated appraisal, they had no basis for determining the current value of the collateral and whether that collateral was still sufficient to support the transaction.

45.     The negligent and grossly negligent approval of this loan participation purchase resulted in substantial damages in an amount to be proved at trial.

## PA, Inc.

46.     Buckhead Bank purchased a 100% participation interest from Empire Financial Services, Inc. for a $1,800,000 loan to PA, Inc.   The purchase was recommended by Holden, and was approved by Aldredge, Cosgray, Douglass, Margeson, and Martindale on March 14, 2006.  The stated purpose of the loan was to allow PA, Inc.'s principal (who was also the only guarantor), who owned an Atlanta event hall, to buy his partner out with an interest-only loan with a one year term.  Importantly, PA, Inc.'s principal and only guarantor already had over $2.5 million of outstanding loans with Buckhead Bank at the time the loan was approved.

47.     The violations of duties by the aforementioned Defendants in regard to the PA, Inc. transaction include, but are not limited to, the following:

   a) Despite Buckhead Bank's 100% interest in the loan, the aforementioned Defendants failed to analyze the loan in accordance with the Bank's own credit standards as if the Bank had originated the loan, in violation of the Loan Policy.  Among other things, the Bank did not obtain an appraisal and instead improperly relied upon a summary appraisal supplied by Empire Financial Services, Inc.

b) Defendants Aldredge, Cosgray, Margeson, and Martindale approved the renewal of the Bank's participation interest in June of 2007. When they approved the renewal, the aforementioned Defendants relied on this (now stale) appraisal that only showed "as is" market value of the collateral as of March 2006. Because they did not obtain an updated appraisal, they had no basis for determining the current value of the collateral and whether that collateral was still sufficient to support the transaction. In fact, the appraisal was inadequate to support the debt.

c) There was insufficient evidence in the loan file that the borrower had the required earnings and cash flow with which to support the debt. Instead, Buckhead Bank purchased a 100% interest in the loan without any meaningful credit information on the borrower.

d) In violation of the Bank's Loan Policy and commercially reasonable banking standards, an adequate analysis of the guarantor's ability to be a viable secondary source of repayment was not performed. The financial information available for the guarantor raised serious questions concerning his ability to provide meaningful cash flow support.

e) The LTV ratio for the loan was higher than permitted by Buckhead Bank's Loan Policy.

48.     The negligent and grossly negligent approval of this loan participation purchase resulted in substantial damages in an amount to be proved at trial.

## ABC, LLC

49.     Buckhead Bank purchased a 53.7% participation interest in a loan to ABC, LLC from First City equal to $4,000,000.00.   The purchase was recommended by Holden, and was approved by Aldredge, Allman, Cosgray, Douglass, Margeson, and Martindale on April 17, 2006.  The stated purpose of the loan was to construct one of three 24,000 square foot 4-story office buildings in McDonough, Georgia.

50.     The violations of duties by the aforementioned Defendants in regard to the ABC, LLC transaction include, but are not limited to, the following:

a) The aforementioned Defendants failed to perform independent underwriting and failed to analyze the loan in accordance with the Bank's own credit standards as if the Bank had originated the loan, in violation of the Loan Policy.  In fact, the financial information in the loan file showed that the borrower and guarantors lacked the required earnings and cash flow with which to support the debt.   If the

Defendants had performed their underwriting duties with the care required by the Loan Policy and commercially reasonable banking standards, they would have seen that the guarantors' net worth was comprised mostly of real estate, raising serious questions concerning the guarantors' ability to provide meaningful cash flow support.

b) The loan file did not contain credit reports for the borrower or the guarantors, in violation of the Loan Policy.

c) The participation purchase was approved despite the lack of other crucial documents required by the Loan Policy, again preventing the aforementioned Defendants from analyzing the loan in connection with Buckhead Bank's own credit standards.  For example, the construction and sale contracts were missing from the loan file.

d) The LTV ratio was greater than the amount allowed by the Loan Policy.

51.    The negligent and grossly negligent approval of this loan participation purchase resulted in substantial damages in an amount to be proved at trial.

## PRD

52.    The $6,073,800.00 PRD loan was approved by Aldredge, Allman, Cosgray, Douglass, Loudermilk, Margeson, and Martindale on April 18, 2006.

- 23 -

The stated purpose of the loan was to provide financing of the acquisition and development for an additional 30 acres into 104 of 243 lots located on Pope Road in Douglasville, Georgia.

53.     The violations of duties by the aforementioned Defendants in regard to the PRD transaction include, but are not limited to, the following:

> a) The aforementioned Defendants failed to manage, supervise, and enforce policies regarding financial reviews, failed to document exceptions to the Loan Policy, and failed to perform due diligence on the borrower.
>
> b) The aforementioned Defendants approved the Bank's loan of the funds even though there was insufficient evidence that the borrower had the required earnings and cash flow with which to support the debt – including a commercial loan application that contained no meaningful financial information and was facially and substantively incomplete.
>
> c) The financial statements provided to support the loan were questionable and failed to adequately reflect the borrowers' financial condition or the guarantors' ability to support the debt.  For example,

- 24 -

the statements of financial condition were not signed, and no financial statements, whatsoever, were obtained for some of the guarantors.

d) The LTV ratio was greater than the amount allowed by the Loan Policy. Particularly, the LTV ratio would have been 136% based on the "as is" (land) market value appraisal. The Loan Policy limit was 75% LTV for land-development loans.

e) The loan file did not contain an appraisal supporting the loan amount. Although an appraisal was performed, the "Collateral Valuation" stated in the loan submission sheet was $5 million greater than the property's appraised "as is" value and was not otherwise supported by the appraisal.

54.     The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

## T&L U, LLC

55.     Buckhead Bank purchased a participation interest in a loan to T&L U, LLC from First City equal to $2,000,000.00. The purchase was recommended by Holden, and was approved by Aldredge, Cosgray, Douglass, Margeson, and Martindale, on July 11, 2006. The stated purpose of the loan was to refinance 11.3

acres to be developed into 16 fully developed and padded commercial office lots as well as 2 additional commercial tracts (totaling 1.3 acres).

56.     The violations of duties by the aforementioned Defendants in regard to the T&L U, LLC transaction include, but are not limited to, the following:

a) The aforementioned Defendants "rubber-stamped" the approval of the purchase of this participation interest without even reviewing the participation agreement.

b) The aforementioned Defendants failed to perform independent underwriting and failed to analyze the loan in accordance with the Bank's own credit standards as if the Bank had originated the loan, in violation of the Loan Policy.  For example, the personal financial statements of the guarantors provided to support the loan were unsigned and not CPA-prepared.  There was no financial information on the borrower in the file, and there was no independent underwriting performed to determine the borrower's financial condition and its ability to repay the loan, absent sales of the commercial lots.

c) Despite this lack of financial information and underwriting, and despite signs that the project was underwater and the loan would not be repaid through lot sales, Defendants Allman, Cosgray, Douglass,

- 26 -

and Margeson approved the renewal of the Bank's participation interest in the loan. As noted in a credit memo, the loan was being renewed and increased due to cost overruns of over $1 million.

d) When the aforementioned Defendants renewed the Bank's participation interest in February of 2007, they relied on a stale appraisal performed when the loan originated, in violation of the Loan Policy. Because they did not obtain an updated appraisal, they had no basis for determining the current value of the collateral – one of the sources of repayment – and whether that collateral was still sufficient to support the transaction.

e) The LTV ratio was greater than the amount allowed by the Loan Policy.

57. The negligent and grossly negligent approval of this loan participation purchase resulted in substantial damages in an amount to be proved at trial.

## JBH, Inc.

58. Buckhead Bank purchased a participation interest in a loan to JBH, Inc. from First City in an amount equal to $1,099,500.00. The purchase was recommended by Holden, and was approved by Allman, Cosgray, Douglass, and Margeson on February 14, 2007. The stated purpose of the loan was to construct

10 "spec" homes in the "Villages at Centerra Ridge" subdivision in Locust Grove, Georgia.

59.     The violations of duties by the aforementioned Defendants in regard to the JBH, Inc. transaction include, but are not limited to, the following:

a) The aforementioned Defendants failed to perform independent underwriting and failed to analyze the loan in accordance with the Bank's own credit standards as if the Bank had originated the loan, in violation of the Loan Policy.  Notably, the aforementioned Defendants approved the purchase of this participation interest even though there were no credit reports in the file for the borrower or the guarantor, there was no documentation to support the net worth of the guarantor given in the credit memorandum, and there was no current financial information for the borrower or the guarantor in the file.

b) The aforementioned Defendants relied on an appraisal that failed to appraise 70% of the collateral.  A memo to the file noted that appraisals were not performed for 7 of the 10 lots because the floor plans were "similar" to the three appraised lots.

60.     The negligent and grossly negligent approval of this loan participation purchase resulted in substantial damages in an amount to be proved at trial.

- 28 -

## PCI, LLC

61.    Buckhead Bank purchased a participation interest in a loan to PCI, LLC from First City equal to $3,000,000.00.  The purchase was recommended by Holden, and was approved by Aldredge, Allman, Cosgray, Douglass, and Margeson on April 17, 2007.  The stated purpose of the loan was to provide financing for the purchase of 26 condominium units, 9 boat slips, 4 garages, and 11 storage units in the Harbour Point Condominium Association at 154 Ethel Wingate Road, Pensacola, Florida, for $14,750,000.  The source of repayment was the sale of condominium units and the cash flow and net worth of the guarantor.

62.    The Bank renewed its participation interest on May 22, 2007, and increased its participation interest by an additional $1,000,000.00.    Holden recommended the renewal, and it was approved by Aldredge, Cosgray, Douglass, Loudermilk, and Margeson.

63.    Notwithstanding that Buckhead Bank was ostensibly only a participant in this loan, with First City as the lead and originating bank, in or around 2009, the Bank's position changed from that of a participant in the loan to the holder of other real estate owned ("OREO") property.  The loan file indicates that Buckhead Bank took over as "lead" bank, even though its own files lacked the

original note, original deed, loan purchase/sales agreement, assignments, or participation documents.

64.    Around the time Buckhead Bank took over as lead bank, Defendants allowed the collateral to be sold at auction for a $4,000,000.00 shortfall. In a credit memorandum dated June 11, 2009, Holden noted that the auction was conducted "[w]ith the lenders' knowledge but not their consent."

65.    The violations of duties by the aforementioned Defendants in regard to the PCI, LLC transaction include, but are not limited to, the following:

a) The aforementioned Defendants failed to perform independent underwriting and failed to analyze the loan in accordance with the Bank's own credit standards as if the Bank had originated the loan, in violation of the Loan Policy. If the aforementioned Defendants had performed their underwriting duties with the care required by the Loan Policy and commercially reasonable banking standards, they would have raised serious questions regarding the viability of the project.    For example, the project was already underwater, and $1,000,000.00 of the original loan amount went to pay off a first mortgage on the property and other creditors.

b) The aforementioned Defendants approved the loan despite the fact that there was no loan application or credit report for the borrower in the file, in violation of the Loan Policy.

c) The financial statements provided to support the loan were questionable and failed to adequately reflect the borrowers' financial condition. For example, there was a nearly $90 million discrepancy between the guarantor's income and net worth, as reflected on the guarantor's 2006 personal financial statement and 2006 tax returns. The majority of the guarantor's net worth was based on real estate owned and the value of closely held businesses. According to the tax returns, the guarantor did not have sufficient cash flow to satisfy the debt.

d) The condominium project was outside of the Bank's stated geographic lending area. Although the Loan Policy required that these "out-of-trade area loans" be approved by the credit committee, the file contains no such special approval and no documentation as to why this transaction should have been approved despite this exception.

66.    The negligent and grossly negligent approval of this loan participation purchase resulted in substantial damages in an amount to be proved at trial.

- 31 -

## BI, LLC

67.     Buckhead Bank purchased a participation interest in a loan to BI, LLC from First City equal to $3,000,000.00.   The purchase was recommended by Holden, and was approved by Aldredge, Cosgray, Douglass, Margeson, and Overall on May 10, 2007.  The stated purpose of the loan was to provide financing for the acquisition and development of 84.86 acres in Fairburn, Georgia, into 257 residential lots in the Brookhaven pod of the Durham Lakes Subdivision, Fairburn, Georgia.

68.     The violations of duties by the aforementioned Defendants in regard to the BI, LLC transaction include, but are not limited to, the following:

a) The aforementioned Defendants "rubber-stamped" this loan purchase without performing their own independent underwriting, in violation of the Loan Policy.

b) The credit information in the file was grossly inadequate.  There were no financial statements for the borrower, no credit reports for either the borrower or the guarantors, and no documents in the file to support the figures given in the guarantors' financial statements.

c) The LTV ratio based on the "as is" market value of the collateral was greater than the amount allowed by the Loan Policy.

d) There was no signed application in the loan file, in violation of the Loan Policy.

69.     The negligent and grossly negligent approval of this loan participation purchase resulted in substantial damages in an amount to be proved at trial.

## LC II, LLC

70.     The $2,600,000.00 LC II, LLC loan was approved by Aldredge, Cosgray, Douglass, Margeson, and Martindale on May 22, 2007.   The stated purpose of the loan was to provide financing to construct a 12,000 square foot retail building on 1.5 acres at the corner of Concord Road and Dunton Street, Smyrna, Georgia.

71.     The violations of duties by the aforementioned Defendants in regard to the LC II, LLC transaction include, but are not limited to, the following:

a) There was insufficient evidence in the loan file that the borrower had the required earnings and cash flow with which to support the debt.

b) The financial statements provided to support the loan were questionable and failed to adequately reflect the guarantor's financial condition.  An adequate analysis of the guarantors' ability to be viable secondary sources of repayment was not performed before the transaction was approved and funded, in violation of the Bank's Loan Policy and

- 33 -

commercially reasonable banking standards.   The guarantors had significant direct and indirect debt levels and debt service obligations that raised serious questions concerning their ability to provide meaningful cash flow support.

c) There was no credit report in the loan file for either the borrower or guarantor.

d) The LTV ratio of 194% (based on the "as is" market value of the collateral) was greater than the amount allowed by the Loan Policy.

72.   The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

### T.J. IG, LLC – July 17, 2007

73.   The $5,035,400.00 T.J. IG, LLC loan was approved by Aldredge, Allman, Cosgray, Douglass, and Margeson on July 17, 2007.  A $1,000,000.00 additional loan was proposed to the Loan Committee and approved on November 11, 2008.  The only loan documents in the file indicating the increase of the loan amount are a Loan Submission Sheet and Loan Committee Minutes dated November 12, 2008.  The stated purpose of the loan was to construct a seventy-eight (78) room, four story, 125,433 square foot Sleep Inn & Suites Hotel on 2.88 acres lot in Sylva, North Carolina.  The repayment source was to be hotel income

- 34 -

after the project was complete, as well as cash flow and net worth of the borrowers and guarantor.

74.    The violations of duties by the aforementioned Defendants in regard to the July 17, 2007 T.J. IG, LLC transaction include, but are not limited to, the following:

a)    The aforementioned Defendants approved and funded the loan before the appraisal was completed. An appraisal report dated August 23, 2007, showed an "as is" market value of the collateral of $500,000.00, which would have resulted in an LTV ratio of 100.7% – greater than the amount allowed by the Loan Policy.

b)    The hotel project was outside of the Bank's stated geographic lending area. Although the Loan Policy required that these "out-of-trade area loans" be approved by the credit committee, the file contains no such special approval and no documentation as to why this transaction should have been approved despite this exception.

c)    The aforementioned Defendants failed to perform adequate underwriting before funding this loan. The financial statements provided to support the loan were questionable and failed to adequately reflect the borrowers' financial condition. For example,

- 35 -

there was no financial information before 2006 in the file for the borrower.   Likewise, the financial information provided for the guarantors was questionable, in that the personal financial statements were not signed or CPA-prepared.

75.    The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

### T.J. IG, LLC – January 29, 2008

76.    Despite the fact that the T.J. IG, LLC hotel project was still only 60% complete and that the borrower already had a $5 million loan from Buckhead Bank, the Bank approved an additional business line of credit.   The $300,000.00 T.J. IG, LLC loan was approved by Aldredge, Cosgray, Douglass, and Martindale on January 29, 2008.   The stated purpose of the loan was to create a business line of credit to be used as working capital.   As with the first T.J. IG, LLC loan, the repayment source was to be hotel income.

77.    The second T.J. IG, LLC loan suffered from the same deficiencies as the first T.J. IG, LLC loan, including, but not limited to, the following:

a) The aforementioned Defendants failed to perform adequate underwriting before funding this loan.   The financial statements provided to support the loan were questionable and failed to adequately reflect the borrowers'

- 36 -

financial condition. For example, there was no financial information before 2006 in the file for the borrower. Likewise, the financial information provided for the guarantors was questionable, in that one of the guarantor's personal financial statements overstated and miscalculated his net worth by approximately $4.6 million, which had to be corrected in the loan submission sheet.

b) The hotel project was outside of the Bank's stated geographic lending area. Although the Loan Policy required that these "out-of-trade area loans" be approved by the credit committee, the file contains no such special approval and no documentation as to why this transaction should have been approved despite this exception.

78.     The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

## HT 32, LLC

79.     The $1,140,000.00 HT 32, LLC loan was approved by Aldredge, Cosgray, Douglass, Loudermilk, Margeson, and Overall on June 10, 2008. The stated purpose of the loan was to renew an existing $4,900,000 loan and increase funding by an additional $1,140,000 for development of 32+\- acres located in Cumming, Georgia.

80.    The violations of duties by the aforementioned Defendants in regard to the HT 32, LLC transaction include, but are not limited to, the following:

a) The aforementioned Defendants approved and funded the loan despite serious issues with the underwriting. For example, one of the guarantor's personal financial statements listed a $150,000 business loan as an asset. There was no financial documentation in the file to support some of the other guarantors' personal financial statements. Further, the borrower's 2008 tax return showed $0 in income, raising serious questions about whether the borrower had the required earnings and cash flow with which to support the debt.

b) There was no credit report in the loan file for the guarantors.

c) The aforementioned Defendants did not obtain an unconditional personal guaranty from one of the principal owners of the borrower, in violation of the Loan Policy.

d) The aforementioned Defendants extended credit based on an incomplete loan application, in violation of the Loan Policy. Particularly, the borrower's loan application contained no financial information upon which an informed lending decision could be based.

    e) The LTV ratio was greater than the amount allowed by the Loan Policy.

    f) Cosgray approved a $98,000 draw request on or about September 17, 2009, even though the loan had already matured and could not be renewed due to the drop in the Bank's legal lending limit.

81.    The negligent and grossly negligent approval of this loan resulted in substantial damages in an amount to be proved at trial.

## V. CAUSES OF ACTION

### Count 1—Ordinary Negligence Under Georgia Law Against All Defendants

82.    The FDIC-R incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

83.    Defendants, as officers and/or directors of Buckhead Bank, each owed the Bank a duty of care under common law and O.C.G.A. §§ 7-1-490, 51-1-2, among other laws and regulations, to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in the management, supervision and conduct of Buckhead Bank's business and financial affairs, including its lending practices. Also, each Defendant agreed and was obligated by statute, contract and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank

operated in compliance with all laws, rules and regulations, as well as all applicable policies, rules, and regulations of the Bank.    The Defendants, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound and prudent.

84.    Defendants are not entitled to the application of the business judgment rule because none of the Defendants' actions or inactions, which are the basis of this negligence claim, was taken in good faith, nor were the Defendants reasonably well-informed in taking such actions or inactions because each of the Defendants ignored regulators' warnings regarding loan underwriting and risk management deficiencies (¶ 36),  repeatedly approved loans in violation of the Loan Policy and Parts 364 and 365 of the FDIC's Rules and Regulations (¶¶ 42-81), and exposed the Bank to undue risk by over-concentrating in ADC/CRE loans and purchasing participations without adequate risk management controls (¶¶ 4, 31-38), despite regulator warnings related thereto (¶ 36).

85.    Defendant Loudermilk, as the founder of Buckhead Bank, Chairman of the Board, and member of the Loan Committee, among other duties, was responsible for the overall management of the Bank including, but not limited to,

the Bank's loan function, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business.  These duties included, but were not limited to: ensuring that the Bank had adequate policies, procedures and internal controls relating to, among other things, ADC/CRE lending, that the Bank adhered to its lending and credit policies, loan approval process and loan and credit administration practices, that the Bank complied with banking statutes/regulations, and that the Bank did not make imprudent loans.  Further, as a member of the Loan Committee, Loudermilk had the duty to ensure that he only approved loans and loan participations that complied with the Bank's Loan Policy and prudent and sound lending practices.

86.     Defendant Cosgray, as CEO of Buckhead Bank and member of the Loan Committee, among other duties, was responsible for the overall management of the Bank, including, but not limited to, ADC/CRE lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business.  These duties included, but were not limited to:  ensuring that the Bank had adequate policies, procedures and internal controls relating to, among other things, ADC/CRE

lending, that the Bank adhered to its lending and credit policies, loan approval process and loan and credit administration practices, and that the Bank complied with banking statutes/regulations.  Cosgray also had the duty to ensure that the Bank did not make imprudent loans and extensions of credit as part of a plan to unreasonably grow the Bank and that he approved loans and loan participations that complied with the Bank's Loan Policy and prudent and sound lending practices.  He also was responsible for supervising various officers, including, but not limited to, Defendants Douglass, Holden, and Overall.

87.     Defendant Douglass, as a regional Bank president and member of the Loan Committee, among other duties, was responsible for oversight of ADC/CRE lending.   Defendant Douglass had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's ADC/CRE lending.   These duties included, but were not limited to, ensuring that the Bank adhered to its policies, procedures, and controls.  Both as an executive officer and member of the Loan Committee, Douglass also had the duty to ensure that the Bank did not make imprudent loans and extensions of credit, complied with the Loan Policy and banking laws and regulations, and that the ADC/CRE lending was conducted in a prudent and sound manner.

88.     Defendant Holden, as a regional Bank president and member of the Loan Committee, among other duties, was responsible for oversight of ADC/CRE lending. Defendant Holden had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's ADC/CRE lending. These duties included, but were not limited to, ensuring that the Bank did not make imprudent loans and extensions of credit, that the Bank adhered to its policies, procedures, and controls, that the Bank complied with the Loan Policy and banking laws and regulations, and that the ADC/CRE lending was conducted in a prudent and sound manner.

89.     Defendant Overall, as Executive Vice President and member of the Loan Committee, among other duties, was responsible for oversight of ADC/CRE lending. Defendant Overall had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's ADC/CRE lending. These duties included, but were not limited to, ensuring that the Bank did not make imprudent loans and extensions of credit, that the Bank adhered to its policies, procedures, and controls, that the Bank complied with the

Loan Policy and banking laws and regulations, and that the ADC/CRE lending was conducted in a prudent and sound manner.

90.    By their actions and inactions, as described specifically and generally herein, Defendants Loudermilk, Cosgray, Douglass, Holden, and Overall failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of the statutory and common law duties of care, as follows.

a.    As to Defendant Loudermilk, his negligent and grossly negligent acts included, without limitation:

(i)    Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)    Approving loans and loan participations despite knowledge of deficiencies in underwriting and loan support, as exhibited by the Exemplar Loans;

(iii)    Failing to implement and follow sound loan underwriting and credit administration practices;

- 44 -

(iv)    Disregarding and failing to take appropriate steps to address warnings and criticisms by regulators with respect to the Bank's ADC/CRE lending and loan participations;

(v)    Failing to inform himself about the risks that the credit transactions posed to the Bank before approving them;

(vi)    Failing to ensure that the loans and loan participations approved by the Loan Committee were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(vii)    Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

(viii)   Failing to ensure that the credit transactions were secured by sufficiently valuable collateral and had sufficient repayment sources to prevent or minimize the risk of loss;

(ix)    Recklessly permitting the pursuit of a high-risk stratagem on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans and loan participations;

(x)    Failing to implement and require bank officers to follow sound loan underwriting and credit administration practices;

- 45 -

(xi)   Failing to implement and monitor prudent risk management strategies;

(xii)   Allowing officers of the Bank repeatedly to violate the Bank's Loan Policy; and

(xiii)   Approving loans and loan participations which violated the Bank's Loan Policy and sound and prudent underwriting standards.

      b.    As to Defendant Cosgray, his negligent and grossly negligent acts included, without limitation:

(i)   Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)   Approving loans and loan participations despite knowledge of deficiencies in underwriting and loan support, as exhibited by the Exemplar Loans;

(iii)   Failing to implement and follow sound loan underwriting and credit administration practices;

(iv)   Disregarding and failing to take appropriate steps to address warnings and criticisms by regulators with respect to the Bank's ADC/CRE lending and loan participations;

- 46 -

(v)    Failing to inform himself about the risks that the credit transactions posed to the Bank before approving them;

(vi)    Failing to ensure that the loans and loan participations approved by the Loan Committee were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(vii)    Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

(viii) Failing to ensure that the credit transactions were secured by sufficiently valuable collateral and had sufficient repayment sources to prevent or minimize the risk of loss;

(ix)    Recklessly permitting the pursuit of a high-risk stratagem on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans and loan participations;

(x)    Failing to implement and require bank officers to follow sound loan underwriting and credit administration practices;

(xi)    Failing to implement and monitor prudent risk management strategies;

(xii)    Allowing officers of the Bank repeatedly to violate the Bank's loan policy; and

- 47 -

(xiii) Approving loans and loan participations which violated the Bank's Loan Policy and sound and prudent underwriting standards.

c.     As to Defendant Douglass, his negligent and grossly negligent acts included, without limitation:

(i)     Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)    Approving loans and loan participations despite knowledge of deficiencies in underwriting and loan support, as exhibited by the Exemplar Loans;

(iii)   Failing to implement and follow sound loan underwriting and credit administration practices;

(iv)    Disregarding and failing to take appropriate steps to address warnings and criticisms by regulators with respect to the Bank's ADC/CRE lending and loan participations;

(v)     Failing to ensure that the loans and loan participations approved by the Loan Committee were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(vi)   Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

(vii)   Failing to ensure that the credit transactions were secured by sufficiently valuable collateral and had sufficient repayment sources to prevent or minimize the risk of loss;

(viii) Recklessly pursuing a high-risk stratagem on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans and loan participations;

(ix)   Approving loans and loan participations which violated the Bank's Loan Policy and sound and prudent underwriting standards.

d.   As to Defendant Holden, his negligent and grossly negligent acts included, without limitation:

(i)   Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)   Recommending loans and loan participations despite knowledge of deficiencies in underwriting and loan support, as exhibited by the Exemplar Loans;

- 49 -

(iii)    Failing to implement and follow sound loan underwriting and credit administration practices;

(iv)    Disregarding and failing to take appropriate steps to address warnings and criticisms by regulators with respect to the Bank's ADC/CRE lending and loan participations;

(v)    Failing to ensure that the loans and loan participations recommended to the Loan Committee were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(vi)    Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

(vii)   Failing to ensure that the credit transactions were secured by sufficiently valuable collateral and had sufficient repayment sources to prevent or minimize the risk of loss;

(viii)  Recklessly pursuing a high-risk stratagem on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans and loan participations;

(ix)    Recommending loans and loan participations which violated the Bank's Loan Policy and sound and prudent underwriting standards.

e.     As to Defendant Overall, his negligent and grossly negligent acts included, without limitation:

(i)     Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)     Approving loans and loan participations despite knowledge of deficiencies in underwriting and loan support, as exhibited by the Exemplar Loans;

(iii)     Failing to implement and follow sound loan underwriting and credit administration practices;

(iv)     Disregarding and failing to take appropriate steps to address warnings and criticisms by regulators with respect to the Bank's ADC/CRE lending and loan participations;

(v)     Failing to inform himself about the risks that the credit transactions posed to the Bank before approving them;

(vi)     Failing to ensure that the loans and loan participations approved by the Loan Committee were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(vii)  Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

(viii)  Failing to ensure that the credit transactions were secured by sufficiently valuable collateral and had sufficient repayment sources to prevent or minimize the risk of loss;

(ix)  Recklessly permitting the pursuit of a high-risk stratagem on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans and loan participations;

(x)  Failing to implement and require bank officers to follow sound loan underwriting and credit administration practices;

(xi)  Failing to implement and monitor prudent risk management strategies;

(xii)  Allowing officers of the Bank repeatedly to violate the Bank's loan policy; and

(xiii)  Approving loans and loan participations which violated the Bank's Loan Policy and sound and prudent underwriting standards.

91.  By way of example and not of limitation, and as described above, the Officer Defendants and Loudermilk failed to adhere to lending policies, applicable requirements, and sound lending practices and thus knew or, in the exercise of

reasonable diligence, should have known that their practices and the practices of other Buckhead Bank officers and employees over whom they exercised supervisory control were improper, imprudent, and harmful to Buckhead Bank.

92.    In addition to the duties set forth in paragraph 83 above, the Director Defendants had the duty under Georgia law to ensure that the Bank's lending policies, banking regulations, prudent loan underwriting, and credit administration practices were followed; to take reasonably prudent steps to ensure that the Bank did not make imprudent loans or extensions of credit as part of a plan to unreasonably grow the Bank; and to exercise ordinary care and diligence in the administration of the affairs of the Bank, including, but not limited to, the following:

a.    Informing themselves about proposed loans and loan participations and the risks the loans and loan participations posed to the Bank before they approved them;

b.    Exercising independent judgment in connection with the review and approval or disapproval of loans and loan participations;

c.    Confirming that any loans and loan participations they approved were underwritten in a safe and sound manner;

- 53 -

d.   Ensuring that any loans and loan participations they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

e.   Not approving loans and loan participations that exceeded the Bank's relevant concentration limits;

f.   Failing to ensure the Bank had adequate capital and other safeguards in place to mitigate the risk of loss from the high concentration of CRE/ADC loans; and

g.   Ensuring that any loans and loan participations approved did not violate applicable banking regulations.

93.   By their common actions and inactions, as described specifically and generally herein, Defendants Loudermilk, Aldredge, Allman, Cosgray, Douglass, Margeson, and Martindale, as directors of the Bank and members of the Loan Committee, collectively failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

a.   Recklessly pursuing an aggressive ADC/CRE lending stratagem that placed short-term income and profits ahead of compliance with the

- 54 -

Bank's policies, banking statutes, and regulations, and prudent and sound lending practices;

b.      Failing to ensure that the Bank's ADC/CRE lending complied with the Bank's policies and procedures, banking statutes, and regulations, and prudent and sound lending practices;

c.      Failing to monitor and supervise the officers and employees of the Bank with respect to ADC/CRE lending;

d.      Disregarding and failing to take appropriate steps to address obvious problems, i.e., "red flags," with respect to the Bank's ADC/CRE lending;

e.      Failing to inform themselves about the risks that the credit transactions posed to the Bank before they approved them;

f.      Failing to exercise independent judgment in connection with the review and approval or disapproval of credit transactions;

g.      Failing to ensure that ADC/CRE loans and loan participations approved by the Loan Committee were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

h.      Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

i.   Failing to ensure that the credit transactions were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

j.   Approving credit transactions that caused the Bank to exceed the Bank's relevant concentration limits;

k.   Failing to implement and require bank officers to follow sound loan underwriting and credit administration practices;

l.   Failing to implement and monitor prudent risk management strategies;

m.   Allowing officers of the Bank repeatedly to violate the Bank's Loan Policy, and approving loans and loan participations that were in material violation of the Bank's Loan Policy; and

n.   Failing to properly supervise and oversee the Bank's loan operations.

94.   With regard to each Director Defendant, the general acts of negligence and gross negligence applicable to each Director Defendants is set forth in paragraphs 31-81.

95.   As a direct and proximate result of the negligent acts and omissions of each Defendant, including their lack of good faith and abuse of discretion, the FDIC-R has suffered Damages in an amount to be proven at trial.

- 56 -

96.     With respect to their actions and inactions in managing the affairs of Buckhead Bank, Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all Damages.

## Count 2 – Gross Negligence Under 12 U.S.C. § 1821 (K) And/Or Georgia Law Against All Defendants.

97.     The FDIC incorporates by reference each of the allegations in the above paragraphs as if fully restated herein.

98.     Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. Georgia law defines "gross negligence" as the absence of that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.

99.     In the alternative, the acts or omissions of each of the Defendants, as described particularly in paragraphs 31-81 of this Complaint, and especially for Damages occurring after the Defendants were warned by regulators, as set forth in paragraph 36, of over-concentration of ADC and CRE loans, deficiencies in loan underwriting and credit administration, and deterioration of the housing market,

which warnings were effectively ignored, demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.

100. Each of the Defendants acted with gross negligence in operating the lending function of the Bank as follows:

a. Defendant Loudermilk by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process; disregarding regulators' warnings (¶ 36); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶¶ 35, 38, 41-81); permitting Bank employees to fund loans and loan participations without compliance with the Loan Policy (¶¶ 41-81); approving loan and loan participation transactions that failed to comply with the Bank's policy and safe and sound lending practices (¶¶ 41-81); and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans and thereby harming Buckhead Bank's earnings, liquidity, and capital-to-asset ratio (¶¶ 31-38).

b. Defendant Cosgray by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence

to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 41-81); permitting Bank employees to fund loans and loan participations without compliance with the Loan Policy (¶¶ 41-81); disregarding regulators' warnings (¶ 36); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶¶ 35, 38, 41-81); and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans and thereby harming Buckhead Bank's earnings, liquidity, and capital-to-asset ratio (¶¶ 31-38).

        c.      Defendant Douglass by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 41-81); disregarding regulators' warnings (¶ 36); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶¶ 35, 38, 41-81); and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans and thereby harming Buckhead Bank's earnings, liquidity, and capital-to-asset ratio (¶¶ 31-38).

- 59 -

d.      Defendant Holden by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including recommending loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 41-81); disregarding regulators' warnings (¶ 36); recommending high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶¶ 35, 38, 41-81); and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans and thereby harming Buckhead Bank's earnings, liquidity, and capital-to-asset ratio (¶¶ 31-38).

d.      Defendant Overall by, among other things, engaging in a pattern and practice of repeatedly failing to follow and failing to require adherence to the loan approval process, including approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 41-81); disregarding regulators' warnings (¶ 36); approving high-risk but poorly underwritten CRE and ADC loans and loan participations despite knowledge of the decline in the local real estate market (¶¶ 35, 38, 41-81); and allowing the Bank's loan portfolio to be overconcentrated in speculative

- 60 -

ADC/CRE loans, thereby harming Buckhead Bank's earnings, liquidity, and capital-to-asset ratio (¶¶ 31-38).

    e. Each Director Defendant as a director and member of the Loan Committee by, among other things, engaging in a common pattern and practice of collectively failing to follow and failing to require adherence to the loan approval process; disregarding regulators' warnings (¶ 36); approving loans and loan participations that failed to comply with the Bank's Loan Policy and safe and sound lending practices (¶¶ 41-81); and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans, thereby harming Buckhead Bank's earnings, liquidity, and capital-to-asset ratio (¶¶ 31-38).

  101. As a direct and proximate result of the Defendants' grossly negligent actions and omissions as described herein, the FDIC-R has suffered Damages in an amount to be proven at trial.

  102. With respect to their grossly negligent actions and inactions in managing the affairs of Buckhead Bank, Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all Damages.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Federal Deposit Insurance Corporation, as Receiver for The Buckhead Community Bank, requests entry of judgment in its favor against Defendants as follows:

1.    For compensatory damages and other damages, jointly and severally, of at least $21.8 million, and any excess amount as may be proved at trial;

2.    For its costs of suit against all Defendants;

3.    For prejudgment and other appropriate interest pursuant to 12 U.S.C. § 1821(l);

4.    Such other and further relief as the Court deems just and proper; and

5.    Plaintiff demands a trial by jury on all issues.

Respectfully submitted this 30th day of November, 2012.

**MILLER & MARTIN PLLC**

By: _____
Charles B. Lee
Georgia Bar No. 443095
Michael P. Kohler
Georgia Bar No. 427727
Laura Ashby
Georgia Bar No. 595907

1170 Peachtree Street, N.E.
Suite 800
Atlanta, GA 30309-7706
Telephone: (404) 962-6100
Facsimile: (404) 962-6300
Email:  clee@millermartin.com
        mkohler@millermartin.com
        lashby@millermartin.com

- and -

Ellis A. Sharp
*To be Admitted Pro Hac Vice*
Tennessee Bar No. 005070
STOKES, WILLIAMS, SHARP & DAVIES
920 Volunteer Landing Lane, Suite 100
Post Office Box 2644
Knoxville, TN 37901
(865) 544-3833
(865) 544-1849 (fax)
sandy@stokeswilliams.com

*Attorneys for Plaintiff Federal Deposit Insurance Corporation, as Receiver for The Buckhead Community Bank*

- 63 -